## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

COMMUNITY INSURANCE      )
SERVICES, LTD.,            )
                       )
     Plaintiff,         )
                       )
     v.                 )     Case No. 05-cv-4105-JPG
                       )
UNITED LIFE INSURANCE COMPANY, )
FIRST FINANCIAL CORPORATION,   )
JACQUE S. PENTELL,        )
                       )
     Defendants.       )

### MEMORANDUM AND ORDER

**GILBERT, District Judge:**

This matter comes before the Court on defendants First Financial Corporation ("First Financial") and Jacque S. Pentell's ("Pentell") motion to dismiss (Doc. 11). Defendants submitted a memorandum of law in support of their motion (Doc. 12), to which plaintiff Community Insurance Services, Ltd. ("Community") has responded (Doc. 16). Community has also filed a motion to dismiss First Financial and Pentell's counterclaim (Doc. 17). Community submitted a memorandum of law in support of this motion (Doc. 18), to which Defendants have responded (Doc. 22). For the following reasons Defendants' motion to dismiss and Community's motion to dismiss counterclaim are **GRANTED**.

### BACKGROUND

Community filed a nine-count complaint that alleges, among other things, defendants engaged in a conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.* In its complaint, Community alleges that Defendants conspired

to defraud it of "proceeds and commissions due under agency agreements for the sale of certain annuity products." (Doc. 1 at 2). As Defendants ask the Court to dismiss the RICO claim in a Rule 12(b)(6) motion, the Court must accept the allegations in the complaint as true. *Brown v. Budz*, 398 F.3d 904, 908 (7th Cir. 2005).

In 1995, plaintiff's predecessor entered into a Premier General Agency Agreement ("PGA") with United Life Insurance Company ("United Life"), under which United Life granted Community the right to market and offer for sale United Life's insurance and annuity products in exchange for Community's receipt of commissions from these sales. (*Id*. at 3). The sole shareholders of Community and its predecessor were Solon "Bud" Pentell ("Bud") and Jaque S. Pentell ("Pentell"). Several years after entering into the agency agreement with United Life, Bud, on behalf of Community, developed a plan to sell United Life products in Illinois and Missouri banks. As part of this business plan, Community planned to hire bank employees at local banks to sell United Life products as "dual agents" under the PGA. Prior to the implementation of this plan, Community and United Life orally agreed on a marketing plan, which would keep United Life from entering into separate agreements with Community's potential customers. (*Id*.). Basically, United Life agreed not to contact banks and other financial institutions that Community had previously contacted without Community's consent. From 1997 to 2000, the parties operated according to this agreement.

In mid-1998, Community entered into an agreement with Community Bank & Trust ("CB&T"). Under this agreement, Community established a branch office at CB&T's Olney (Illinois) facility to sell United Life annuities and other products. CB&T hired Bud's wife, Pentell (defendant here) as a part-time employee to train the "dual agents" in the sale of United Life products. Over the years, Community hired and trained at least 20 CB&T employees as agents

under the PGA.  Through its agents at CB&T, Community generated gross commissions and bonuses exceeding $1.2 million from 1997 to 2001.  The stability of this arrangement started to break down in late 2001 when Bud and Pentell divorced.  Under the terms of the divorce decree Pentell assigned her entire interest in Community to Bud.  Soon after this, First Financial acquired CB&T, and renamed it First Community Bank ("First Community").  Bud notified United Life of First Financial's acquisition of CB&T and requested that United Life not grant First Financial or its subsidiaries a direct agency agreement without his consent – pursuant to United Life's prior agreement and consistent with the course of dealing between them during the previous four years. (*Id*. at 5).  United Life's vice president, Ronald Brandt, assured Bud that it would maintain the status quo.  (*Id*.).

On June 17, 2002, First Financial notified Community of its intent to terminate its branch office agreement and to transfer all of its insurance and annuity services to Forest Scherer Insurance, Inc., one of its wholly-owned affiliates ("Forrest Scherer").  First Financial also demanded that Community return "all files and trail commissions on annuity policies" sold by Community at its First Community (previously CB&T) branch offices.  (*Id*.).  In August 2002, Community discovered that United Life had entered into a PGA with Forrest Scherer without its consent.  In addition, United Life released confidential information concerning Community's annuity customer accounts without Community's consent.  Surely more disturbing to Bud from a personal perspective, Pentell, while still a "down line" agent of Community, became a full time employee of First Community and Forest Scherer; she continued to sell United Life products for First Community in much the same way as she had under the prior agreement.  (*Id*. at 6).  Perhaps more disturbing from a business perspective, First Community and Forrest Scherer executed change of agency forms given them by

United Life allowing them to solicit Community's annuity customers.  United Life also transferred Community's "down line" agents under Community's branch agreement with CB&T to Forrest Scherer without Community's consent.

Community discovered in late 2002 that First Financial, through First Community and Forrest Scherer, contacted Community's annuity customers through a direct mailing, soliciting them to change their agency from Community to Forrest Scherer.  In this mailing, First Financial misrepresented certain facts to Community's customers.  It mistakenly told these customers that Pentell was their current agent, when in fact, Community remained their agent.  First Financial also told these individuals their agent would remain the same, which was false because contrary to its representations, their agent – still Community – did not work for First Community.  First Financial also told them that the change in agency would not affect their annuity contracts.  In its mass mailing, First Financial included a change of agency form, which it characterized as an "acknowledgment," informing these individuals that Forrest Scherer was their agent, when in fact it could not become their agent unless they signed the form. (*Id*. at 7).  United Life also refused to transfer Janet Sue Piper ("Piper") – it is unclear from the complaint and briefs whether the transfer was Community's request or her own– a "down line" agent of Forrest Scherer to Community without Forrest Scherer's consent, despite the fact that she was transferred to Forrest Scherer without Community's consent.  In pursuance of the above, defendants used the U.S. Postal Service to mail information to Community's customers.  *See* 18 U.S.C. § 1341.  Defendants also used "wire communications in interstate commerce" to secure Community's customer accounts. *See* 18 U.S.C. § 1343.

## ANALYSIS

-4-

### A.      Dismissal under Rule 12(b)(6)

When reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts all allegations as true and draws all reasonable inferences in favor of the plaintiff.  *Brown*, 398 F.3d at 908; *Holman v. Indiana*, 211 F.3d 399, 402 (7th Cir. 2000).  The Court should not grant a motion to dismiss unless it appears beyond doubt that the plaintiff cannot prove his claim under any set of facts consistent with the complaint.  *Brown*, 398 F.3d at 908-09; *Holman*, 211 F.3d at 405.  "[I]f it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate."  *Brown*, 398 F.3d at 909 (internal quotations omitted).

Generally, courts will not grant a motion to dismiss merely because the complaint is vague or lacking in detail so long as it pleads "the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer."  *Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir. 2002); *see Brown*, 398 F.3d at 908; *Strauss v. City of Chicago*, 760 F.2d 765 (7th Cir. 1985).  A complaint does not fail to state a claim merely because it does not set forth a complete and convincing picture of the alleged wrongdoing.  *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998); *American Nurses' Ass'n v. Illinois*, 783 F.2d 716, 727 (7th Cir. 1986).  Nor must it allege all, or any, of the facts logically entailed by the claim.  *Higgs,* 286 F.3d at 439; *Bennett*, 153 F.3d at 518; *American Nurses'*, 783 F.2d at 727.  Nonetheless, the complaint must provide a short and plain statement of the claim sufficient to fairly put the defendant on notice of the claim and its basis.  *Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993); *Brown*, 398 F.3d at 908;  *see also* Fed. R. Civ. P. 8(a).

In the context of pleading conspiracies, the general "short and plain" statement rule is not

upset. *Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003). Put another way, conspiracy pleadings are not subject to the heightened pleading requirements in F.R.Civ.P. 9(a). *Id.*; *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002). All a plaintiff must do is "indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with." *Hoskins*, 320 F.3d at 764; *Walker*, 288 F.3d at 1007. However, in the RICO context, allegations of fraudulent conduct must specify, with particularity, the circumstances of the alleged fraud. *Slaney v. The Intern. Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001); *Haroco, Inc. v. Am. Nat. Bank and Trust Co.*, 747 F.2d 384, 405 (7th Cir. 1984). To meet this standard, a plaintiff must describe the two predicate acts of fraud with specificity and the "time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Slaney*, 244 F.3d at 597.

**B.     RICO Conspiracy Claims**

Before addressing Defendants' specific arguments, a review of the RICO statute and the cases interpreting its provisions is necessary. Initially, the Court notes that Defendants do not contest much of the basis for Community's RICO claim. For example, they do not deny that they and Community are persons within the meaning of the statute, *see* 18 U.S.C. §§ 1961(3), 1962(c) & 1962(d); that Community is an enterprise within the meaning of the statute, *see* 18 U.S.C. § 1961(4); or that they were engaged in activities that affect interstate commerce. *See* 18 U.S.C. § 1962(c) & (d). As its first claim for relief, Community alleges a conspiracy to violate 18 U.S.C. § 1962(c). 18 U.S.C. §§ 1962(c) & (d), That provision (§ 1962(c)) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To state a claim for relief under this section Community must show the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir. 1995) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

The target of § 1962(d) is the agreement to violate RICO, not the violations themselves. *Slaney*, 244 F.3d at 600 ("[T]he touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute.") (citation omitted). To state a claim for conspiracy under this section a plaintiff must allege "(1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Id*. It is unnecessary for the plaintiff to allege that each defendant personally agreed to commit the two acts so long as it alleges that those involved agreed that the actions would be committed on behalf of the conspiracy. *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 784 (7th Cir. 1999) (allegations sufficient so long as plaintiff alleges that each defendant agreed "to participate in an endeavor which, if completed, would constitute a violation of" RICO) (internal quotation and citation omitted); *see also Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 961 (7th Cir. 1996). It is important to note that these agreements can be inferred from the circumstances and need be supported by direct evidence. *Id*. Even so, conclusory allegations of "conspiracy" are not sufficient to state a claim under § 1962(d). *Otto v. Variable Annuity Life Ins. Co.*, 814 F.2d 1127, 1137 (7th Cir. 1986). The complaint must include "supportive factual allegations describing the general composition of the

conspiracy, some or all of its broad objectives, and the defendant's general role in the conspiracy." *Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 733 (7th Cir. 1998) (citation omitted).

Defendants make no arguments on the first two elements of the prima facie violation of § 1962(c). They do claim, however, that Community has failed to allege a pattern of racketeering activity sufficiently. A pattern of racketeering activity consists of at least two predicate acts of racketeering– including mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343 – committed within a ten-year period. 18 U.S.C. § 1961(5). Whether a pattern of racketeering activity exists is a fact-specific inquiry which hinges on, among other things: "(1) the number and variety of the predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries." *Gagan*, 77 F.3d at 962-63. These considerations, termed the *Morgan* factors after the Seventh Circuit's decision in *Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir.1986), are now analyzed "with an eye towards achieving a natural and common sense result." *420 E. Ohio Ltd. P-Ship v. Cocose*, 980 F.2d 1122, 1124 (7th Cir. 1992) (internal citation and quotations omitted). The *Morgan* factors are used to analyze whether a particular factual situation meets the "continuity plus relationship" test set forth by the Supreme Court in *Sedima, S.P.R.L. v. Imrex Co.* Under this test "the predicate acts must be related to one another (the relationship prong) *and* pose a threat of continued criminal activity (the continuity prong)." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992) (citing *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239) (1989).

The Seventh Circuit, along with its sister circuits, has stressed a common sense approach to the pattern requirement in a RICO action. *See, e.g., U.S. Textiles, Inc. v. Anheuser-Busch Cos., Inc.*, 911 F.2d 1261, 1267 (7th Cir. 1990); *420 E. Ohio Ltd. P-Ship*, 980 F.2d at 1124. To this end, courts

must remember that Congress "intended to limit RICO to those cases in which racketeering acts are committed in a manner characterizing the defendant as a person who regularly commits such crimes." *Lipin Enters. Inc. v. Lee*, 803 F.2d 322, 324 (7th Cir 1986). Thus, there "must be some indication of a threat of continuing activity by the defendants, not just one instance of fraud with a single victim." *Id*. (internal quotation and citation omitted). In the end, Courts must be cognizant that in enacting RICO, Congress was concerned with "long-term criminal conduct." *H.J., Inc.*, 492 U.S. at 242.

### C.   Pleading Deficiencies

#### i.   Predicate Acts

Defendants claim Community failed sufficiently to allege two predicate acts as required. Essentially, Defendants claim the only predicate act alleged in the complaint was the December 2002 mass mailing. The other allegations that they furthered their scheme "on numerous occasions" and in "multiple instances" of mail and wire fraud are mere conclusory allegations insufficient to meet the requirements of Rule 9(b). (Doc. 1 at ¶¶ 27, 28 and 35). In response, Community argues the complaint paints a picture of Defendants and their subordinates using the mail and telephone for fraudulent purposes at various points in time leading up to the December mailing. In paragraph 20 of the complaint, Community alleges that a few months before First Financial's acquisition of CB&T United Life's vice president, Ronald Brandt, gave Bud assurances over the telephone several times (in late 2001) that United Life would follow its course of dealing after the acquisition. Though the complaint does not provide the exact dates for these communications, given the other allegations in the complaint, this fact, if true, is a sufficient allegation of a second predicate act.

#### ii.   Relationship

The relationship prong of the test if the predicate acts have the "same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.,* 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)).  The relationship must imply that "the predicate acts were committed somewhat closely in time to one another, involve the same victim, or involve the same type of misconduct." *U.S. Textiles, Inc.*, 911 F.2d at 1267.  Defendants claim the lack of specificity in the complaint makes  it impossible to determine whether Community has pleaded a RICO violation adequately. Community claims that the complaint adequately shows that Defendants engaged in a course of action intended to defraud and eventually defrauding Community.  After reviewing the complaint, the Court finds that the allegations sufficiently alleged that the acts were taken pursuant to a scheme to deprive Community of its customers and their information.  Therefore, the Court finds that Community has pleaded the relationship regarding Defendants' predicate acts.

### iii.    Continuity

### a.    Close-ended

The continuity prong can be satisfied in two ways: by showing a close- or open-period of racketeering activity.  When a plaintiff alleges a "close-ended" period of racketeering activity, he must prove that this activity continued for a "substantial period of time."  *Midwest Grinding*, 976 F.2d at 1022-23 ("The underlying rationale is that the duration and repetition of the criminal activity carries with it an implicit threat of continued criminal activity in the future."); *H.J. Inc.,* 492 U.S. at 242.  The Supreme Court has said that acts "extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement."  *H.J. Inc.,* 492 U.S. at 242. Though somewhat hesitant to construct a bright line period of time which is "substantial" for these

purposes, the Seventh Circuit has indicated that a period less than 2 years in a case such as this is probably insufficient.  *See Midwest Grinding*, 976 F.2d at 1024 (nine months insufficient); *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 663 (7th Cir. 1992) (finding that allegations involving multiple acts of mail fraud over a period of years insufficient when they were in furtherance of a single scheme and the injuries were not distinct); *J.D. Marshall Intern., Inc. v. Redstart, Inc.*, 935 F.2d 815, 819-20 (7th Cir. 1991) (thirteen-month period insufficient to show necessary pattern)  *420 E. Ohio Ltd. P'Ship*, 980 F.2d at 1225 ("[W]e do not believe six months qualifies as [a] 'substantial period of time'"); *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 780 (7th Cir. 1994) ("The cases in our circuit . . . demonstrate that a time frame of less than nine months likely does not satisfy the duration requirement.").  The Seventh Circuit has repeatedly stressed that no single factor in the *Morgan* analysis – including whether the  activities continued for a substantial period of time, the first *Morgan* factor – is dispositve.  Even so, in those cases where a plaintiff predicates a RICO violation on mail and wire fraud, on one scheme (lasting less than two years) with one victim, courts are *extremely* unlikely to find sufficient continuity.

As the Court has noted, a close-ended period of racketeering activity only establishes the requisite continuity if the acts sufficiently indicate a likelihood of future criminal activity.  In *Gagan*, the Seventh Circuit noted, like the Supreme Court and the other courts of appeals, that many plaintiffs try to "dress up" state law fraud claims using as their tool the expansive definitions of mail and wire fraud under federal law.  *Gagan*, 77 F.3d at 963.  In any number of instances that Seventh Circuit has held that RICO claims based on mail and wire fraud are unique because the multiplicity of the individual instances of this type of fraud do not suggest that future occurrences of fraudulent conduct are likely.  *See, e.g., id.*; *U.S. Textiles, Inc.*, 911 F.2d at 1268; *J.D. Marshall Intern.*, 935

F.2d at 819-20.  In short, "multiple acts of mail fraud in furtherance of a single episode of fraud involving one victim relating to one basic transaction cannot constitute the necessary pattern." *Gagan*, 77 F.3d at 963 (quoting *Jones v. Lampe*, 845 F.2d 755, 757 (7th Cir. 1988); *see also J.D. Marshall Intern., Inc.*, 935 F.2d at 821 ("[T]he fact that [defendant's] alleged violations constituted a single scheme . . . involved a single victim . . . and were predicated upon a single transaction" strongly suggest that a pattern of racketeering was not alleged).  A case in point is *U.S. Textiles, Inc. v. Anhueser-Busch Companies, Inc.*, 911 F.2d at 1263-64. There, U.S. Textiles ("UST") claimed that Anhueser-Busch ("AB") engaged in a pattern of racketeering activity relating to a contract under which UST agreed to provide certain merchandise to AB on a discounted basis.  *Id*.  UST claimed AB committed extortion through the contract – entered in 1980 – and facilitated this scheme through the use of the mail and telephone over a two-year period.  *Id*. at 1268.  The Court found that these activities did not amount to a pattern of racketeering activity under RICO.  Though UST suffered economic injury over the course of a two years, that injury was the result of, and complete when, it entered the 1980 contract.  *Id*.  The number of acts and the length of time over which they occurred was "pure happenstance."  *Id*.  The Court grounded its finding on the pattern requirement on a number of factors.  Most important to that decision were the facts that UST was the only victim, the existence of one scheme and the absence of separate and distinct injuries resulting from the fraud.  *Id*. at 1263-68.  Though cognizant of the holding in *H.J., Inc. – i.e.,* multiple schemes are not required to establish a RICO violation – the Seventh Circuit still views the existence of one scheme as a factor which strongly suggests that the requisite continuity does not exist.  *Id*.

Community, of course, claims that it has shown a close-ended period of racketeering activity. Because Brandt fraudulently gave assurances in late 2001 and First Financial did not mail the change

of agency forms until December 2004, it claims the activities necessarily took place over a substantial period of time.  There are a couple of problems with its argument here.  In the first instance, its claim that First Financial mailed the change of agency forms in December 2004 directly contradicts the allegations in the complaint.  In paragraph 23, Community claimed that in "early December, 2002, [it] discovered that First Financial . . . solicited [its annuity] customers to change their agency from [Community] to Forrest Scherer." (Doc. 1 ¶ 23).  According to that paragraph, the mailing took place in December 2002.  (*Id.*).  Thus, the period is not so substantial as it would have the Court believe.  Giving Community the benefit of the doubt, the fraud here occurred over a period of about 14 or 15 months.  Given the nature of this case, the period over which Defendants acted does not support an inference of continuity.  *See Midwest Grinding Co.*, 976 F.2d at 1024 (collecting cases).

Under the first *Morgan* factor, the Court should also look to the number and variety of the predicate acts.  Community claims that each packet mailed to each individual customer constituted a separate predicate act.  This is probably true, but basically irrelevant.  First Financial essentially mailed the same information to Community's customers at the same time – December 2002.  The Court must view this fact through the lens shaped by Seventh Circuit precedent and, at bottom, take a common sense approach in its analysis.  It is clear that this argument, even if true, deserves little weight.  The other alleged predicate acts, primarily the phone call from the United Life VP, were all in pursuance of this same scheme.  They were directed at one entity or individual, Community or Bud.  Even if United Life's alleged demand to Community to surrender its customer files is a sufficient predicate act, it was still directed toward Community and goes to the same essential goal of the alleged conspiracy, taking Community's clients and business.  The same goes for United

-13-

Life's provision of confidential information to Pentell and First Financial.  In this context, "to defraud" means "wronging one in his property rights by dishonest methods or schemes and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *Corley v. Rosewood Care Ctr., Inc*., 388 F.3d 990, 1005 (7th Cir. 2004) (internal quotations and citations omitted).  These last two allegations of predicate acts do not fall within this definition.  Thus, in terms of distinct acts, Community has alleged two.  The mailing and the assurances from United Life.  Nothing from the allegations suggests the pattern necessary to state a claim for a RICO violation.

Under *Morgan*, this Court is also directed to evaluate the continuity prong with reference to the number of victims, number of schemes and the number of injuries.  Community does not dispute that the fraud that occurred here is the result of one scheme – in fact, this a key component of its argument.  Community does, however, claim that Defendants' actions harmed a number of victims and resulted in a number of distinct injuries.  Community insists that its former customers and "dual agents" were victims of Defendants' scheme.  The allegations in its complaint do not support these contentions.  It is quite hard to characterize either of these groups as victims when Community has not alleged any facts which show that they have been injured.  As the Court has already said, in the mail and wire fraud context, to defraud means using tricks or artifices to deprive one of something of value.  *See Corley*, 388 F.3d at 1005.  The facts do not show, and the Court is put to some difficulty in hypothesizing a reasonable set of facts consistent with the complaint which would show an injury sufficient to characterize either of these groups as true victims of Defendants' scheme.[1]

---

[1]For what it is worth, no member of either of these groups is a fellow plaintiff in this action.

-14-

Community has not alleged that any of Community's former customers lost any money or anything else, tangible or otherwise.  In fact, Community has not even alleged that any of its former customers were upset or even annoyed by the United Life's actions.  Community did claim that these individuals were harmed when United Life disclosed their financial information to First Financial. Given the other allegations in the complaint, this sounds like an injury to Community, not its customers.  Community indicated in its brief that many of its records were kept at the branch offices. Thus, it is somewhat difficult to conceive what information United Life might have disclosed that First Financial did not already have in its possession.  If the Court were to suppose that United Life disclosed information to First Financial which it did not already possess, it is difficult to see how a customer which switched to First Financial was harmed if First Financial is now his agent.  For the rest, perhaps the Court could conceive of some damage resulting from the disclosure of this information. Nonetheless, no facts suggest that Defendants used this information in any way other than to try to attract these clients to First Financial.  If the disclosure did deprive the customers of something tangible, the loss was not so substantial or significant that it merited further description in the complaint or briefs.

Community's arguments regarding its former "dual agents" are similarly unpersuasive.  In its complaint, Community alleged that United Life refused to transfer one these agents, Piper, to Community.  The complaint does not make clear whether Community or Piper herself requested the transfer.  If it was Community, Piper could not fairly be characterized as victim of the fraud.  Even if Piper made the request and was not transferred, it is still quite difficult to regard her as a victim of the scheme.  Community does not allege any specific injury to Piper or otherwise show how she was damaged by United Life's refusal.  Further, if the Court accepts Community's claims that

-15-

Defendants have usurped its clients, it seems Piper would have been hurt by a transfer to Community because she would have fewer or no clients to service. In its complaint, Community claims United Life failed to transfer Piper in February 2003. Thus, this action took place 2 or 3 months after First Financial conducted the mass mailing. It simply is not clear how Piper can be viewed as a victim of the scheme. Community essentially claims Defendants took or tried to take its clients and hurt its business. The only circumstance that has changed from the agents' perspective – at least from what can be found in the complaint – is the ownership of the business, but one must question whether this is really a cognizable injury. Businesses change ownership frequently. Apparently, little has changed now that the bank is owned by First Financial. United Life's refusal to transfer Piper is tangentially related, at best, to any fraud perpetrated on Community.

Under *Morgan*, the Court must also determine whether Community suffered distinct injuries from Defendants' actions. Community claims that each mailing to each Community customer constituted a separate predicate act and inflicted a distinct injury. The distinct injuries Community claims are the loss of its commission for each customer. In support of this claim, Community offers *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 63 F.3d 516 (7th Cir. 1995). In *Uniroyal*, the Seventh Circuit held that Uniroyal established that Mutual Trading Corp. ("MTC") engaged in a pattern of racketeering activity under RICO, despite the fact that Uniroyal was its only victim. *Id*. at 523-24. In *Uniroyal*, MTC engaged in at least four unrelated and distinct schemes to defraud Uniroyal. These schemes took place over a four-year period and were facilitated by the activities of a Uniroyal employee whom MTC bribed at least twice in amounts exceeding $20,000.00. With this employee's help MTC conducted a false reimbursement scheme in Saudi Arabia, an advertising scheme in Nigeria, and various bookkeeping schemes in the United States. *Id*. at 519-20. In its

-16-

relation of the facts of the case, the Court took note of at least 7 distinct predicate fraudulent acts taken by MTC and its subordinates in the course of these schemes.  *Id*.  Community directs this Court to the following statement in *Uniroyal*, "[T]he repeated infliction of economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering for purposes of civil RICO."  *Id*. at 524 (internal citation and quotation omitted).  Of course, the Court did not apply that statement in the case because it found MTC has perpetrated at least four separate schemes on Uniroyal.  Under this Court's reading of the case, it was the existence of these separate schemes which led to that Court's determination that Uniroyal had suffered distinct injuries.  *See id*. at 524. Also significant was the fact that there was no interdependence amongst the predicate acts.  *Id*.  The court distinguished *Uniroyal* from cases like *Olive Can Co. v. Martin*, 906 F.2d 1147, 1150 (7th Cir. 1990) and *Lipin Enters. v. Lee* – cases where there was an interdependence amongst the predicate acts and non-discrete injuries.  *Id*.  In those cases, the fraudulent representations were all related to the perpetration of one larger scheme.  In *Uniroyal* – given the distinct injuries, the distinct predicate acts, the distinct schemes and the length of the period of illegal activity – the Court found the existence of a pattern of racketeering activity.  *Uniroyal Goodrich Tire* Co., 63 F.3d at 524.

This case is distinguishable from *Uniroyal* on all these fronts.  To the extent there were numerous predicate acts, they were all taken in pursuance of one scheme and the period of activity lasted approximately 14 months –  less than a third of the time in *Uniroyal*.  Additionally,  the scheme here did not result in "distinct" injuries as that term is used in RICO cases.  In *U.S. Textiles, Inc.*, the Seventh Circuit analyzed the term "distinct" in this context. There, the Court found that UST did not suffer separate and distinct injuries from the deliveries it made under a contract over the course of several years.  *U.S. Textiles, Inc.*, 911 F.2d at 1268-69.  Though it was arguable that

-17-

UST suffered a distinct injury each time it shipped discounted merchandise under the contract, the Court found that they were not "distinct" in the sense that each injury itself signaled or constituted a threat of continuing criminal activity. *Id* at 1269. Taking a "natural and common sense approach" the court held that "identical economic injuries suffered over the course of two years stemming from a single contract were not the type of injuries Congress intended to compensate via" RICO. *Id. See also, J.D. Marshal Intern. Inc.*, 935 F.2d at 820 & 821 (finding that allegations of fraud "involv[ing] the same type of misconduct . . . occurr[ing] within . . . thirteen months . . . and . . . all related by a common purpose" did not show a genuine threat of continued criminal activity); *Elliott v. Chicago Motor Club Ins.*, 809 F.2d 347, 350 (7th Cir. 1986) ("Because [the] predicate acts all clearly relate to the same transaction involving a single insurance policy and arising out of one accident, the acts do not support the continuity aspect of the pattern of racketeering."). As the term "distinct" was defined in *U.S. Textiles, Inc.* and applied in *Uniroyal*, the Court finds that based on the allegations in the complaint, Community has failed to show it has suffered distinct injuries.

After reviewing the complaint, the briefs and the relevant case law, the Court concludes that Community's complaint does not include allegations from which this Court can conclude that Defendants engaged in a pattern of racketeering activity under the close-ended continuity prong. The Court is convinced that the dispute between the parties is not one covered under RICO. Defendants' alleged actions are not of the sort indicative of future criminal conduct. The allegations simply do not support an inference that Defendants are career criminals who are likely to perpetrate similar acts again. Nothing in the complaint suggests that any of the defendants regularly conduct business in the manner alleged here, or indeed, have ever acted similarly. In the end, this action is in the nature of a business dispute arising from a series of unfortunate occurrences which negatively

-18-

affected Bud both personally and financially.  This was a single scheme taking place for little over a year, defrauding and injuring one victim. Considered as a whole, the allegations in the complaint fail to show a pattern of racketeering activity.

### b.    Open-ended

"An open-ended period of racketeering . . . is a course of criminal activity which lacks the duration and repetition to establish continuity." *Midwest Grinding*, 976 F.2d at 1023.  Even so, a plaintiff can meet the continuity prong of the ""continuity plus relationship" test by "showing past conduct which 'by its nature projects into the future with a threat of repetition.'" *Id*. (quoting *H.J. Inc.,* 492 U.S. at 242).  This threat of continuity exists when a plaintiff can show "(1) a 'specific threat of repetition,' (2) that the 'predicate acts or offenses are part of an ongoing entity's regular way of doing business,' or (3) that the defendant operates a 'long-term association that exists for criminal purposes.'" *Midwest Grinding*, 976 F.2d at 1023 (quoting *H.J. Inc.,* 492 U.S. at 242-43).

As Community has framed its RICO allegations in the past tense, Defendants claim Community has failed to show that there is any likelihood of future criminal acts on behalf of any of the defendants.  Aside from this stylistic objection, Defendants claim Community has failed to establish that First Financial and Pentell have a long-standing criminal association or that they are likely to, or pose a specific threat of, engaging in this or any other kind of criminal conduct in the future.  Community argues that Defendants pose a specific threat because United Life owes it a duty of confidentiality with regard to its customers' accounts and because First Financial and Pentell have exclusive access to Community's files, which were located at the Olney facility.  Further, Community argues that the complaint contains allegations from which the Court can reasonably infer that this is the regular way that First Financial and Pentell do business.

The Court finds Community's arguments without merit on these points.   Certainly Community has alleged facts from which the Court can reasonably infer the existence of a duty on United Life's part.   However, this fact does not support the inference that United Life poses a specific threat of repeating the conduct alleged in the complaint again.   That United Life may owe a duty to Community has no bearing whatsoever on whether it is likely to use its position of trust against entities similar to Community, or to Community again.   Further, its duty to Community does not reasonably support an inference that its actions here were representative of the way it normally conducts its business.

Essentially, Community has alleged a scheme in which Defendants conspired to usurp its customers and their information.   The very fact that Defendants have taken Community's customers, information and former employees shows they will not be able to do it again; for its customers, their information and its former agents are gone.   Thus, they cannot pose a specific threat of repeating this conduct because they have nothing left to gain, and as Community is claiming losses of $1.2 million, it has nothing left to lose.   *See Midwest Grinding*, 976 F.2d at 1023.   If one accepts Community's recitation of the events in this case, the circumstances which allowed Defendants to perpetrate this scheme were the product of Community's – really Bud's – extraordinarily bad turn of luck.   The sequence of events in this case reads like a nightmare from Bud's perspective.   However, the unique nature of these events makes it quite unlikely or impossible for something similar to happen in the future.   Their idiosyncratic nature also strongly counsels against any inference that the actions of Pentell and First Community here are representative of the regular way they conduct their business activities.

Bud's wife became an employee of CB&T while she was part owner of Community with

Bud.  Obviously, she stood in a position of trust with respect to Bud and Community, and took a manager-in-the-field role for Community.  She trained the "dual agents" and the records of Community's customers were kept at her office – CB&T's Olney facility.  When she divorced Bud in late 2001, she divested herself of her interest in Community, but retained her position with CB&T.  It is at this time when United Life originally made its first fraudulent representation.  Over the next year, Defendants essentially took Community's business.  Certainly Pentell's position as former owner of Community and its lead representative vis-a-vis its clients put her in the unique position to facilitate the fraud alleged.  That she allegedly engaged in this fraud makes it extraordinarily unlikely if not impossible that Community/Bud would repose this kind of trust in her again.  Community's contention that First Financial's and Pentell's acts support an inference that this is their regular way of doing business is simply farcical.  There are no facts which suggest that Pentell works for or is affiliated with any business other than First Financial and its subsidiaries and affiliates.  Nothing in the complaint suggests that she has acted similarly in the past or that it would even be possible for her to act similarly in the future.  Further, there is little chance Bud will suffer any further dupery at the hands of his ex-wife; if one believes Bud's version of events, that sheep has most assuredly been skinned.  With respect to First Financial, Community has not alleged that it stands in relation to any other entities in a manner similar to its standing with Community.  Community has not include allegations detailing any of First Financial's conduct not relating to this litigation.  The allegations regarding First Financial's conduct here do not themselves support an inference that this is First Financial's modus operandi.  As with Pentell, even drawing all inferences in Community's favor, the allegations here do not support the notion that Community was just another notch on First Financial's belt.  Rather, they simply paint the picture of a business taking

advantage of the situation presented it.  Thus, Community cannot show the requisite continuity under this mode of analysis either.  For the same reasons as the Court discussed under its discussion of the close-ended period  analysis, the Court finds that Community has not shown the requisite pattern of racketeering activity.

**D.    Defendants' Counterclaim**

On September 9, 2005, First Financial and Pentell filed a counterclaim in this action against Community for Community's inclusion of what Defendants characterize as its "frivolous, unreasonable and groundless" RICO claim.  (Doc. 10 at 2).  For reasons explained in their motion to dismiss, Defendants claim Community knew or should have known that its RICO allegations were "unmeritorious."(*Id*.).  Therefore, Defendants claim they "are entitled to punitive damages as [a] result of Community['s] malice, gross negligence, recklessness and oppressive conduct in pursuing the frivolous Complaint."  (*Id*. at 3).  Defendants claim this Court has supplemental jurisdiction to adjudicate their counterclaim under 28 U.S.C. § 1367.  Community moved for dismissal of this counterclaim under Rule 12(b)(6) claiming Defendants have failed to state a claim upon which relief can be granted.  They characterize Defendants' counterclaim as a motion for sanctions under Rule 11, and claim that they failed to comply with the procedures set forth therein; specifically, Community claims Defendants should have submitted their motion to Community and given them the 21-day period to withdraw the claim pursuant to Fed.R.Civ.P. 11(c)(1)(A).  Community also claims the Court is without jurisdiction to hear this counterclaim because it does not arise from the same transaction or occurrence as the underlying action, and that the proper vehicle for bringing such allegations before the Court is a motion under Rule 11.  In response, Defendants reject the notion that they brought their counterclaim pursuant to Rule 11.  They claim that Rule 11 is not the

exclusive source for the Court's authority to sanction parties for filing frivolous claims.  More specifically, they claim the Court has the inherent authority to control actions before it and may sanction a party for contempt of court.  Perhaps admitting that Rule 11 was the appropriate vehicle for asserting their claims, Defendants believe that Community's brief in opposition to Defendants' motion to dismiss renders any notice requirements on the sanctions front moot.  As Community had notice of Defendants' claims on this score, Defendants should not be punished for their failure to take a futile act.  *See Cole v. Tansy*, 926 F.2d 955, 957 (10th Cir. 1991).  Finally, Defendants reaffirm their assertion that the Court has supplemental jurisdiction to hear their counterclaim.

Having dedicated a significant amount of effort to the resolution of Defendants' motion to dismiss, the Court considers itself well-acquainted with the relative merits of Community's RICO claim. The Court has determined that the allegations in the complaint do not support Community's RICO claim.  The Court believes that, at best, Community has set forth what the Seventh Circuit has termed a garden-variety fraud case concerning what is best described as a business dispute.  As the Court discussed at some length, the allegations in the complaint do not support the inference that Defendants in this case are seasoned criminals capable or likely to commit similar or more devious crimes in the future.  Though the Court views it as exceedingly unlikely that Community can, consistent with its duty of good faith, include allegations in some amended pleading that would support a claim under RICO, it is not so unlikely that the Court would characterize it as impossible. Though the Court has concluded that Community's claim is without merit, it is unwilling to declare its inclusion of this claim as an action worthy of censure more severe than an order dismissing the claim.

As Defendants have raised the frivolity of the RICO claim in a counterclaim, the Court is in

an unusual situation.  If Defendants had brought this issue before the Court by way of Rule 11, as they should have done, the Court would simply have denied the motion.  However, because they have brought a separate counterclaim, the Court must give the issue more treatment than it rightly deserves.  The Court most certainly possesses the inherent authority to sanction litigants for frivolous filings.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-44 (1991).  That a party can state a cause of action for frivolous filing does not flow naturally from the foregoing proposition.  However, Defendants claim *Chambers* and 28 U.S.C. § 1927 show that such a cause of action is permissible.  In *Chambers*, the Court rejected the assertion that the statutory provision of remedies for sanctions (*e.g.*, Rule 11, § 1927) deprived courts of their inherent power to sanction inappropriate conduct.  *Id*. at 43-44.  In that case, the Court said nothing which would support Defendants' claim that they can permissibly state a cause of action for frivolous filing.  In any event, *Chambers* counsels restraint and discretion in the exercise of a court's inherent powers.  *Id*. Therefore, to the extent a Court *is* permitted to entertain a cause of action for frivolous filing, which is a proposition the Court believes to be unfounded, the Court declines to exercise its inherent power to entertain such an action.  *See id*. at 44.  Therefore, the Court **GRANTS** Community's motion to dismiss Defendants' counterclaim.  Finally, given the Court's determinations with regard to First Financial and Pentell, the Court **ORDERS** Community to **SHOW CAUSE on or before April 10, 2006** why it should not dismiss the RICO claim against Defendant United Life.

## CONCLUSION

Defendants' motion to dismiss (Doc. 11) is **GRANTED**.   Community's motion to dismiss Defendants counterclaim (Doc. 17) is **GRANTED**.  Community's RICO claim against defendants First Financial and Pentell and Defendants' counterclaim are therefore **DISMISSED**.  Community

-24-

shall **SHOW CAUSE on or before April 10, 2006** why the Court should not dismiss the RICO claim against United Life.  The **Clerk of Court** is **DIRECTED** to enter judgment accordingly at the end of this case.

      **IT IS SO ORDERED.**

      **Dated: March 24, 2006.**

                                   **/s/ J. Phil Gilbert**
                                     **J. PHIL GILBERT**
                                     **U.S. District Judge**