UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| COMMUNITY INSURANCE SERVICES, LTD., <br><br> Plaintiff, <br><br> v. <br><br> UNITED LIFE INSURANCE COMPANY, FIRST FINANCIAL CORPORATION, JACQUE S. PENTELL, <br><br> Defendants. | Case No. 05-cv-4105 -JPG |

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendants First Financial Corporation's and Jacque S. Pentell's Motion for Summary Judgment (Doc. 62). Plaintiff Community Insurance Services, Inc. has responded (Doc. 68) and Defendants have replied (Doc. 69). Defendants have also filed a Motion for a Hearing on the Motion for Summary Judgment (Doc. 65). For the following reasons, the Court **DENIES** in part and **GRANTS** in part the Motion for Summary Judgment (Doc. 62). The Court **DENIES** the Motion for a Hearing (Doc. 65).

## BACKGROUND

**I.      Summary Judgment Standard**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.,* 211 F.3d 392, 396 (7th Cir. 2000). The Court construes all facts in the light most favorable to the nonmoving party and draws all justifiable inferences in the

nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Spath,* 211 F.3d at 396.

  The moving party has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp.,* 477 U.S. at 323. If it meets this burden, the nonmoving party must set forth facts that demonstrate the existence of a genuine issue of material fact. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 322-26; *Johnson v. City of Fort Wayne,* 91 F.3d 922, 931 (7th Cir. 1996). The nonmoving party must do more than cast "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000). Rather, the nonmoving party must demonstrate to the Court that the evidence is such that a reasonable jury could return a verdict in his favor. *Anderson,* 477 U.S. at 248; *Insolia v. Phillip Morris, Inc.,* 216 F.3d 596 (7th Cir. 2000). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Anderson,* 477 U.S. at 248-250.

**II.** **Facts**

  Construing the evidence in the light most favorable to Community Insurance Services, and drawing all reasonable inferences in its favor, the evidence establishes the following facts. Solon "Bud" Pentell (Bud) and Jacque Pentell (Jacque) were married in 1977. Jacque and Bud, along with two other individuals, Richard and Gretta Davis, began Community Insurance Services (CIS) as a partnership in June 1995. On June 1, 1995, CIS entered into a Premier General Agency Agreement (PGA) with United Life Insurance Company (United Life). Under the PGA, United Life granted CIS the right to market and offer for sale United Life's insurance and annuity products in exchange for CIS's receipt of commissions from these sales. In late 1997 or early 1998, CIS incorporated. Later in 1998, Bud and Jacque bought the shares held by

Richard and Gretta Davis, and became the only two shareholders of CIS, each holding one-half of CIS's stock.

Several years after entering into the agency agreement with United Life, Bud, on behalf of CIS, developed a plan to sell United Life products in Illinois and Missouri banks. As part of this business plan, CIS planned to hire bank employees at local banks to sell United Life products as "dual agents" under the PGA. Prior to the implementation of this plan, CIS and United Life orally agreed on a marketing plan, which would keep United Life from entering into separate agreements with CIS's potential customers. Essentially, United Life agreed not to contact banks and other financial institutions that CIS had previously contacted without CIS's consent. From 1997 to 2000, the parties operated according to this agreement.

In mid-1998, CIS entered into an agreement with Community Bank & Trust ("CB&T"). Under this agreement, CIS established a branch office at CB&T's Olney, Illinois facility to sell United Life annuities and other products. CB&T hired Jacque as a part-time employee to train the "dual agents" in the sale of United Life products. Over the years, CIS hired and trained at least 20 CB&T employees as agents under the PGA. Through its agents at CB&T, CIS generated gross commissions and bonuses exceeding $1.2 million from 1997 to 2001.

In late 2001 Bud and Jacque divorced. Under the terms of the divorce decree, Jacque assigned her entire interest in CIS to Bud. Soon after this, First Financial Corporation (First Financial) acquired CB&T, and renamed it First Community Bank ("First Community").[1] Bud notified United Life of First Financial's acquisition of CB&T and requested that United Life not grant First Financial or its subsidiaries a direct agency agreement without CIS's consent –

---

[1] In 2005, First Community Bank merged with First Financial Bank and became the Olney, Illinois Branch of First Financial Bank, NA.

pursuant to United Life's prior agreement and consistent with the course of dealing between them during the previous four years. United Life's vice president, Ronald Brandt, assured Bud that United Life would maintain the status quo.

On June 17, 2002, First Community notified CIS of its intent to terminate its branch office agreement and to transfer all of its insurance and annuity services to Forrest Scherer Insurance, Inc., a wholly-owned affiliate of First Financial ("Forrest Scherer"). First Community also demanded that CIS return "all files and trail commissions on annuity policies" sold by CIS at its Olney, Illinois branch office (previously CB&T). Meanwhile, Jacque, still a "down line" agent of CIS, became a full-time employee of First Community and Forrest Scherer; continuing to sell United Life products for First Community in much the same way as she had under the prior agreement.

In August 2002, First Community's President, Larry Burbank (Burbank), contacted United Life and instructed United Life to send all future annuity correspondence for First Community customers to Forrest Scherer. Burbank told United Life to direct any questions regarding the transfer contact to himself or Jacque. Whereupon, United Life entered into a PGA with Forrest Scherer, and released confidential information concerning CIS's annuity customer accounts to Forrest Scherer, without CIS's consent. United Life also transferred CIS's "down line" agents under CIS's branch agreement with CB&T to Forrest Scherer without CIS's consent.

In late 2002, in a direct mailing signed by Burbank and Jacque, First Community contacted CIS's annuity customers, soliciting them to change their agency from CIS to Forrest Scherer. In its mass mailing, First Community included a change of agency form it had obtained from United Life. First Community characterized this form as an "acknowledgment," informing

the annuity customers that Forrest Scherer was their agent, when in fact Forrest Scherer could not become their agent unless they signed the form. First Community also told these customers that their current agent, an employee of First Community, would remain the same. In fact, CIS, which was not an employee of First Community, was the customer's current agent.

## ANALYSIS

CIS brought this action in diversity alleging conspiracy to defraud CIS of proceeds and commissions due it under agency agreements for the sale of United Life annuity products by Jacque and First Financial, breach of contract by First Financial, and tortious interference with its oral contract with United Life by Jacque and First Financial.

Both Defendants request summary judgment on the civil conspiracy claim on the basis that there is no evidence from which a reasonable jury could conclude a conspiracy to defraud. Additionally, First Financial asserts that it is not the correct defendant for any of the claims against it, because it is merely the parent company of the actual actor, First Community, and is not responsible for the contract obligations or torts, if any, of First Community. As such, First Financial requests that summary judgment be entered in its favor on the claims against it. Jacque requests that summary judgment be entered in her favor on the claim of tortious interference with existing business relationships because she acted in the scope of her employment, and so asserts she has a qualified privilege against such claims. A federal court sitting in diversity applies the substantive law of the state in which the district resides. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2005).

**I.      Breach of Contract Claim Against First Financial**

The well-settled general rule in Illinois is that a corporation that purchases the assets of

another corporation is not liable for the debts or liabilities of the transferor corporation. *Vernon v. Schuster*, 688 N.E.2d 1172, 1175 (Ill. 1997); *Nilsson v. Cont'l Mach. Mfg. Co.*, 621 N.E.2d 1032 (Ill. App. Ct. 1993); *People ex rel. Donahue v. Perkins & Will Architects, Inc.*, 413 N.E.2d 29 (Ill. App. Ct. 1980).

There are four exceptions to the general rule of successor corporate nonliability: (1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations. *Schuster* at 1175-76.  According to Illinois law, a corporation that merges with another corporation assumes all obligations and liabilities of the latter corporation. *Myers v. Putzmeister, Inc.*, 596 N.E.2d 754, 755 (Ill. App. Ct. 1992); *Knoll Pharm. Co. v. Auto. Ins. Co.,* 167 F.Supp.2d 1004, 1010 (N.D. Ill. 2001).

First Financial requests summary judgment on this claim on the grounds that it was never a party to the branch office agreement with CIS, was not the entity that terminated the contract, nor was it the entity that committed a breach, if any, of the contract.  CIS counters that First Financial assumed the contract obligations of CB&T when it acquired the bank.  CIS claims that the purchase by First Financial of CB&T amounted to a merger of the two.  However, it offers no evidence in support of this contention to counter the affidavit by First Financial CEO, Norman L. Lowery, that at all times First Financial and CB&T (later First Community and later still First Financial Bank) were at all times separate and distinct legal entities.  Further CIS offers no evidence that any of the other four exceptions to the general rule of successor corporate nonliabilty apply.  As a result, no reasonable jury could conclude that First Financial had any obligations under the branch office contract, nor can it be held liable for any breach of that

6

contract. Therefore, summary judgment in favor of First Financial is appropriate on this issue.

## II.  Tortious Interference with Oral Contract between CIS and United Life

Illinois has long recognized tortious interference with an existing contract as cause of action. *See, e.g., Swager v. Couri*, 395 N.E.2d 921, 926 (Ill. 1979); *Stafford v. Puro,* 63 F.3d 1436, 1441(7th Cir. 1995). This claim requires (1) proof of a legally enforceable contract; (2) the defendant's knowledge of that contract; (3) the defendant's intentional interference inducing a breach by a party to the contract; (4) and damages. *Delloma v. Consol. Coal Co.*, 996 F.2d 168, 171 (7th Cir. 1993); *Stafford* at 1441.

### A.  There is Evidence of a Legally Enforceable Contract

CIS has presented evidence in the form of the testimony of Bud Pentell as to the existence of an oral contract between CIS and United Life whereby CIS would establish branch offices in certain banks and United Life would refrain from contracting directly with those banks without CIS's prior approval. Therefore, CIS may be able to prove the existence of the first element of the claim.

### B.  There is Evidence that CIS Suffered Damages

CIS has evidence in the form of past commissions and projected future commissions as to the damages it suffered as a result of United Life's breach of the oral contract. Therefore, CIS may be able to prove the fourth element of tortious interference with its oral contract with United Life.

### C.  There is Evidence that Jacque Personally Knew of the Contract, but not that First Financial Knew of the Contract

CIS has presented evidence in the form of testimony by Bud Pentell, that Jacque, a former partner and fifty-percent shareholder in CIS had knowledge of the oral contract between

CIS and United Life. However, CIS has presented no evidence from which a jury could conclude that Jacque's knowledge of the oral contract can be imputed to First Financial.

CIS presents no evidence that Jacque actually informed First Financial of the oral contract between CIS and United Life. Instead, CIS contends that her knowledge should be imputed to First Financial, the corporate parent of her employer, First Community. However, not all knowledge held by an agent will be imputed to her principal.

Generally, where a corporate agent obtains knowledge while acting in the scope of her agency, she presumably reports that knowledge to her corporate principal, so the court imputes such knowledge to a corporation. *U.S. v. One Parcel of Land Located at 7326 Highway 45 North, Three Lakes, Oneida County, Wis.,* 965 F.2d 311, 316 -317 (7th Cir. 1992). However, where an agent obtains knowledge while acting outside the scope of his agency, the standard presumption is unfounded, and the court will not impute the agent's knowledge to the corporation. *Id.* Here, Jacque's knowledge of the oral contract between CIS and United Life was obtained during the time that she was a partner and shareholder of CIS, but before she became an agent of First Community, such that her knowledge cannot be imputed to First Community.

Furthermore, as discussed above, First Community and First Financial are separate and distinct legal entities such that even if Jacque's knowledge could be imputed to her employer, First Community, First Community's imputed knowledge would then have to be further imputed to First Financial. Without further evidence, a reasonable jury could not conclude that First Financial had knowledge of the oral contract in question merely because an employee of one of its affiliates had such knowledge.

**D.     There is no Evidence that First Financial Induced United Life to Breach its Contract**

Finally, even assuming that First Financial knew of the oral contract between CIS and United Life, CIS has presented no evidence from which a reasonable jury could conclude that First Financial took any action to induce United Life to breach that contract. The evidence may be such that a reasonable jury could conclude that First Community induced United Life to breach its contract with CIS. However, "the law does not attribute responsibility for the torts of a subsidiary to its parent, let alone regard the parent as the real wrongdoer...." *Jinwoong, Inc. v. Jinwoong, Inc.*, 310 F.3d 962, 966 (7th Cir. 2002). CIS relies on the fact that United Life's breach of its oral contract with CIS was beneficial to First Financial - because another affiliate of First Financial, Forrest Scherer, ultimately took over CIS's annuity accounts - as evidence that some action by First Financial must have induced the breach. However, this conclusion is entirely too speculative for a reasonable jury to reach from the evidence presented.

Because CIS has presented no evidence from which a reasonable jury could conclude that First Financial knew of the oral contract between CIS and United Life, nor any evidence from which to conclude First Financial took any action to induce United Life to breach that contract, First Financial is entitled to summary judgment on the claim against it for tortious interference with contract.

**E.     There is Evidence that Jacque Induced United Life to Breach its Contract**

CIS has presented a letter to United Life from First Community directing United Life to broker the bank's United Life annuities through Forrest Scherer instead of CIS and referring questions about the letter to Jacque. From this evidence, a reasonable jury could conclude that this direction to United Life that it breach its oral contract with CIS came from Jacque. Thus, as

9

against Jacque, all four elements of the claim for tortious interference with contract can be satisfied.

In her defense, Jacque asserts that she cannot be sued in her individual capacity for torts she committed while acting in the scope of her employment for First Community. While normally an agent is not liable for the conduct of her principal, she is liable for her own torts. *Goldstein v. Scott*, 439 N.E.2d 1039, 1044 (Ill. App. Ct. 1982), *Pretzel & Stouffer, Chartered v. Imperial Adjusters, Inc.*, 28 F.3d 42, 46 (7th Cir. 1994). Here, CIS does not seek to hold Jacque accountable on an agency theory for the torts of First Community; rather CIS claims that Jacque's accountability arises from her own actions.

Furthermore, while an officer of a corporation cannot normally be held liable for acts she performs as the corporation's agent, she will be held liable for acts done in violation of some duty she personally owes to the third person. *Goldstein* at 1044. Here, there is ample evidence that Jacque, still a "down line" agent for CIS, violated a duty owed to CIS by assisting in effectuating the transfer of United Life's annuities contracts from CIS to Forrest Scherer.

Jacque also asserts a qualified privilege against a suit for tortious interference with contract on the grounds that she was acting as an officer of First Community in her company's best interests. She cites *Cress v. Recreation, Inc.*, 795 N.E.2d 817 (Ill. App. Ct. 2003), for this proposition. However, as CIS points out, *Cress* and the line of cases it follows all have to do with a corporate officer's individual liability for inducing his company to breach a contract *to which it was a party*. "[W]here the plaintiff alleges that the defendant, in his capacity as a corporate officer, tortiously interfered with a contract between the plaintiff and *that* corporation, the plaintiff must plead that the defendant acted outside the qualified privilege he enjoys as a corporate officer to influence the actions of the corporation." *Id.* at 843-44 (emphasis added). In

such a case, the inducing party - the corporation through the actions of its officer - and the breaching party - the corporation through the actions of its officer - are one and the same, and a person cannot be said to have tortiously induced himself to take an action. *Fiumetto v. Garrett Enters., Inc.*, 749 N.E.2d 992 (Ill. App. Ct. 2001).

However, here, Jacque was acting on behalf of her company to induce a breach of a contract between two other companies. The inducing party - Jacque or First Community through Jacque - and the breaching party - United Life - cannot be said to be the same. Therefore, Jacque cannot claim this privilege.

Because CIS has presented evidence from which a reasonable jury could conclude that there was a valid oral contract between CIS and United Life, that Jacque knew of the contract, that Jacque induced United Life to Breach the contract, and that CIS suffered damages as a result, summary judgment for Jacque on this claim is inappropriate.

**III.     Civil Conspiracy**

A civil conspiracy occurs when two or more people combine to accomplish, through concerted action, either an unlawful act or a lawful act in an unlawful manner. *Multiut Corp. v. Draiman,* 834 N.E.2d 43, 51-2 (Ill. App. Ct. 2005). A defendant "who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives is liable as a conspirator." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994). Often there will be no direct proof of a conspiracy; rather circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances will point toward a finding of conspiracy. *McClure v. Owens Corning Fiberglass Corp.*, 720 N.E.2d at 258 (Ill. 1999). However, if a civil conspiracy is shown by circumstantial evidence alone, that evidence must be

clear and convincing. *Id.*

Here, CIS has presented evidence, in the form of a letter signed by both First Community President Larry Burbank and Jacque Pentell, containing what a reasonable jury could conclude were intentional misrepresentations of fact aimed at fraudulently inducing CIS's annuities customers to change their annuities agent from CIS to Forrest Scherer. Therefore, a reasonable jury could find by clear and convincing evidence that Jacque and at least one other person conspired to commit fraud. Accordingly, summary judgment is not appropriate as to Jacque Pentell on the civil conspiracy claim.

However, again, CIS has failed to present any evidence of any action taken by First Financial or of any agreement between First Financial and First Community or Jacque that would tie it to the conspiracy. Nor, as discussed above, has CIS presented any evidence that the actions of First Community can be imputed to First Financial. Therefore, First Financial is entitled to summary judgment on the civil conspiracy claim.

## CONCLUSION

In conclusion, the Court **GRANTS** in Part and **DENIES** in part the Motion for Summary Judgment (Doc. 62). As to all claims against Defendant First Financial Corporation the Court **GRANTS** the Motion for Summary Judgment. As to all claims against Defendant Jacque Pentell the Court **DENIES** the Motion for Summary Judgment. The Court having been fully briefed as to this Motion and having rendered its decision, **DENIES** Defendant's Motion for a

Hearing on the Motion for Summary Judgment (Doc. 65).  The Court **DIRECTS** the Clerk of

Court to enter judgment accordingly at the close of this case.

**IT IS SO ORDERED.**
**DATED: September 13, 2007**

<u>s/ J. Phil Gilbert</u>
**J. PHIL GILBERT**
**DISTRICT JUDGE**
